(No. 6621. July 8, 1939.)

MILWAUKEE LAND COMPANY, a Corporation, Respondent, v. LAMBERT BOGLE, Appellant.

[92 Pac. (2d) 1065.]

Carl M. Buell, N. D. Wernette and Edward M. Connelly, for Appellant.

Wm. D. Keeton, for Respondent.

AILSHIE, C. J.—August 22, 1933, respondent, Milwaukee Land Company, a corporation, entered into a contract with appellant, Lambert Bogle, and William Sullivan, a co-partnership, whereby the corporation sold to the co-partnership, all the merchantable white pine and yellow pine timber and all the cedar poles on 678 acres of land in Benewah and Shoshone counties for $27,497.50. $5,500 of the purchase price was paid in cash and Bogle and Sullivan, in payment of the balance thereof, executed and delivered to respondent four promissory notes dated August 22, 1933, each bearing interest at 6 per cent per annum, as follows: a note for $7,000 payable on or before September 22, 1933; a note for $7,000 payable on or before October 22, 1933; a note for $7,000 payable on or before November 22, 1933; a note for $997.50 payable on or before December 22, 1933. September 9, 1937, the note for $997.50 and $2,318.68, balance of the principal of the note which became due November 22, 1933, together with interest on both amounts from March 26, 1936, were unpaid and respondent commenced this action against appellant and Sullivan to recover the money due thereon. Service of summons could not be made on Sullivan within the state and no judgment was taken against him.

Bogle answered the complaint and thereafter filed two successive amended answers, and the case went to trial on the issues framed by the complaint and second amended answer. Bogle admitted the execution of the notes in which he obligated himself to pay the sums of money therein specified, together with interest thereon, and that he had made payments as in the complaint alleged, but denied there was a balance due on the indebtedness. As an affirmative defense, in his second amended answer, Bogle alleged in part as follows:

That he "fully performed in all respects all of the provisions, terms and obligations imposed upon him by virtue of said contract, up to and including the spring of 1935,

when, owing to unusual weather conditions, consisting of floods, prolonged rains, and extremely high water, it was temporarily impossible for said defendant to continue his logging operations upon said lands. That at that time the said plaintiff, acting by and through its lawfully appointed, qualified agent, to-wit: Arthur Douglas, availed itself of certain rights which it claimed existed in paragraph 14 of said contract herein designated as Exhibit A, and did through said agent, to-wit: Arthur Douglas, *orally* declare a forfeiture of said contract, and did *orally* inform this defendant that said contract was no longer in force and effect, and did orally instruct this defendant, Lambert Bogle, to break camp and leave the lands described in said contract designated herein as Exhibit A, and upon which this defendant had been conducting logging operations, and that defendant agreed to and acquiesced in the request of said plaintiff, as expressed through its agent, Arthur Douglas, . . . . That the said plaintiff, in availing itself of its claimed rights under paragraph 14 of said contract expressed in Exhibit A hereto attached, did revest in itself the title to 1,400,000 feet of yellow pine standing timber, which it had owned at the time it entered into the contract with this defendant, . . . . That the value of said 1,400,000 feet of said yellow pine timber at said time, to-wit: in the spring of 1936, was $4.00 per thousand feet, or $5,600.00.

"That while this defendant acquiesced in and agreed to the termination of said contract, he had not desired to do so, but was forced to do so by coercion and intimidation of the said Arthur Douglas, who, in taking advantage of the unusual flood and weather conditions then prevailing in the locality in which defendant was logging and in which the land described herein is situated, stated to defendant that he would insist upon strict compliance with the contract, even though floods, high water, washed-out roads and other weather conditions constituted a bar to the continuance of logging operations at said time."

He alleged that Sullivan, for valuable consideration, had sold and assigned his interest in the contract and proceeds therefrom to Bogle, and then set out the contract as an ex-

hibit to and part of his answer. The contract recites that vendor "does give, *grant, bargain and sell* unto the said Vendees all of the merchantable White Pine, Yellow Pine timber and all of the Cedar Poles, standing, lying and being on the following described land . . . . subject to the following limitations, reservations, conditions, and upon the following terms . . . . "

Paragraph 11 of the contract reads as follows:

"It is further stipulated and agreed by the said Vendees that in the event the Vendor shall, at any time or times determine that the value of the White Pine and Yellow Pine timber and the Cedar Poles remaining uncut on said lands is less than the amount of the purchase price remaining unpaid, it may notify the Vendees in writing of such determination, and require the Vendees to pay unto the Vendor such sum of money, to be applied upon said purchase price notes, as the Vendor may deem necessary, to the end that the value of the White Pine and Yellow Pine timber and the Cedar Poles remaining uncut on said lands shall be not less than the amount of the purchase price remaining unpaid; and the Vendees shall, and hereby agree that they will, immediately upon the receipt of such notice, pay unto the Vendor the sum of money so demanded, which payment shall be applied as a credit upon the said purchase price notes; Provided, that the Vendees may, in lieu of making such payment, immediately cease cutting and removing said timber from said lands until such time as the payments made according to the terms of said purchase price notes, aggregate such sum that the value of the White Pine and Yellow Pine timber and the Cedar Poles remaining uncut on said lands shall not be less than the amount of the purchase price remaining unpaid."

Paragraph 12 gave to the company "a lien upon all timber and logs upon said lands to secure the full payment of said purchase price notes," and "all taxes and fire assessments," forest patrol charges, etc., which might accrue or be or become liens on the land.

Paragraph 13 requires that "all logs cut from the timber on the land covered by this contract will be *shipped to the*

*Ohio Match Company* at Heutter, Idaho, and the lumber cut from said lots, or an equivalent amount, will be shipped over the railroad lines of the Chicago, Milwaukee and St. Paul and Pacific Railroad Company, and the Vendees further agree that all Cedar Poles cut from the land covered by this contract shall be shipped over the railroad lines of the Chicago, Milwaukee, St. Paul and Pacific Railroad Company,'' etc.

Paragraph 14 is as follows:

''Time is of the essence of this contract, and in case of the failure of the Vendees to pay the purchase price notes as and when required by the provisions hereof, or the said taxes and fire assessments, as hereinbefore provided, or to keep or perform any of the covenants or agreements to be by them kept and performed, as hereinbefore set forth, the Vendor may, at its election, treat such failure as a breach of a condition subsequent, and forfeit and determine all grants, rights and privileges hereby granted to or conferred upon the Vendees. Such right of forfeiture shall be exercised by service of written notice thereof upon the Vendees. Such notice may be served by delivery of same to the Vendees, or by depositing same, with the postage thereon prepaid, in a United States Post Office, addressed to the Vendees at Spokane, Washington. Upon the service of such notice of forfeiture, all right of the Vendees to enter upon said lands, or any thereof, and to cut or remove therefrom any timber or logs standing, lying or being thereon, as well as all other rights and privileges hereby granted to the Vendees, shall forthwith end and determine, and all right, title and interest in and to said timber and logs shall immediately vest and be in the Vendor. The Vendor, notwithstanding any such forfeiture, may and shall retain all payments theretofore made to it by the Vendees under the provisions hereof, as compensation for timber cut and removed by the Vendees hereunder, and as damages for the breach of said contract by the Vendees; Provided, further, that the Vendor may, in addition to such forfeiture and retention of payments, recover of and from the Vendees any further or other damages which it may have sustained by reason of such, or any,

breach of said contract by the Vendees. In the event of the forfeiture of said grant, rights and privileges as aforesaid, and the payment of all lawful claims theretofore accrued under this contract by reason of any breach thereof by the Vendees, the Vendor shall cancel and return to the Vendees said purchase price notes remaining unpaid. Failure by the Vendor to exercise any right of forfeiture or other remedial right for a breach of any covenant, stipulation or condition by the Vendees, shall not be construed as a waiver of such covenant, stipulation or condition, and the Vendor shall have and may exercise such right in the event of any future breach of such covenant, stipulation or condition.''

The second amended answer further alleges that defendant had not failed in any respect to perform his part of the contract, and that the notice of intention to oust him from the premises was wholly unjustifiable; that plaintiff neglected and failed to cancel the remaining unpaid notes and return them to defendant; and defendant prayed that plaintiff take nothing by its action. Most of the evidence offered in support of these allegations was admitted conditionally; and after all the evidence was in, plaintiff moved for an instructed verdict in its favor, on the ground that the defendant had not produced evidence sufficient to constitute a defense to plaintiff's action. Thereupon counsel for defendant made the following motion:

''Mr. Connelly: The defendant Bogle, if Your Honor please, moves the court to make and enter an order, directing that his affirmative defense, wherein he alleges an agreement to terminate this contract, and whereafter and in every paragraph of the complaint where that allegation appears, that he and Mr. Douglas acting for the plaintiff, agreed to terminate this contract, that those allegations and paragraphs containing such allegations, be deemed *amended to conform to the proof educed on the witness stand, as to such agreement to terminate the contract.*''

The motion was denied apparently upon the ground that the defendant was relying upon a forfeiture declared under the provisions of paragraph 14 of the contract, and that no such forfeiture had been shown. The court thereupon in-

structed the jury to return a verdict in favor of plaintiff. The jury accordingly returned a verdict in favor of the plaintiff for the amount claimed.

▉▉ It is now argued by appellant that the court erred in not allowing the amendment as requested by appellant's counsel at the conclusion of the case so as to conform to the proofs; and that the court also erred in not submitting the case to the jury on general instructions.

We think the court should have allowed the amendment for the reason that it did not materially change the issue. Appellant's counsel at the opening of the trial stated to the court and jury his defense and the evidence he proposed to introduce, a part of which was as follows:

"that after defendant Bogle had logged on the property for about a year and a half, weather and market conditions became bad and the price of yellow pine depreciated; that the plaintiff's representative, Arthur Douglas, continuously sought more money from defendant Bogle to apply upon the balance due upon his notes; that he several times threatened to 'throw Bogle off the job' unless more money was forthcoming on the notes from Bogle; that the evidence would show that in the spring of 1935 plaintiff's representative, Arthur Douglas, informed Bogle that it seemed useless for him to continue his logging operations, that everything had been cut except the yellow pine; that there was ample yellow pine standing on the property to offset the balance due on the notes, and that 'nobody would be hurt as long as it was standing,' and instructed Bogle to cease logging operations under the contract . . . . that Mr. Bogle agreed to these instructions and notice of Arthur Douglas, and that Mr. Douglas and Mr. Bogle thereupon agreed between themselves to terminate Bogle's logging contract, and that thereafter Bogle did not cut any standing timber upon the land described in the contract, but did skid and remove from said land all of the white pine lumber and cedar poles which had already been cut, and did take care of the brush disposal, as required by the laws of the State of Idaho, following said conversation."

The evidence was before the court and jury and plaintiff was in no sense surprised or prejudiced, and, as we view the

matter, there was no *substantial* variance between the pleadings and proofs.

What was said by this court in *Newman v. Great Shoshone & T. F. W. P. Co.*, 28 Ida. 764, 156 Pac. 111, is peculiarly applicable to the circumstances disclosed by the record under consideration. It was there said:

"It appears to us that the evidence supports the allegations of the complaint and that no variance existed, but it is unnecessary to decide that question in this case for *if a variance did exist,* it is clear that appellant was not misled to its prejudice thereby and this contention is disposed of by sec. 4225, Rev. Codes, which provides:

"No variance between the allegation in a pleading and the proof is to be deemed material, unless it has actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits. . . . . "

Plaintiff could not have misled. (*Davidson Grocery Co. v. Johnston,* 24 Ida. 336, 133 Pac. 929, Ann. Cas. 1915C, 1129; *Peck v. Nixon,* 47 Ida. 675, 277 Pac. 1112; see, also, *Duthweiler v. Hanson,* 54 Ida. 46, 28 Pac. (2d) 210.)

The court might very well have considered the answer amended in so far as necessary to conform to the proofs. (Sec. 5–902, I. C. A.; *Pennsylvania-Coeur d'Alene Min. Co. v. Gallagher,* 19 Ida. 101, 112 Pac. 1044; *Clopton v. Meeves,* 24 Ida. 293, 133 Pac. 907; *Mole v. Payne,* 39 Ida. 247, 254, 227 Pac. 23; *Harrison v. Russell & Co.,* 17 Ida. 196, 203, 105 Pac. 48.)

The fact that no written notice of forfeiture was given to defendant, under paragraph 14 of the contract, *supra,* was not decisive or controlling, for the reason that the requirement for a *written notice* of election on the part of the company to forfeit the contract was made for the protection of the vendee and not as a shield for the vendor. The provision for written notice would in no way preclude the vendee from waiving such notice and acting upon the oral declaration of the vendor.

Now as to whether or not the evidence established Douglas' agency to represent the plaintiff company, in making this adjustment and declaring an end to the contract as to such timber as was not then cut, became a question of fact

to be determined by the jury. There was evidence submitted which entitled the defendant to go to the jury, among which was the following: Defendant testified that he had *never had any negotiations with any other agent or representative of the plaintiff in connection with the making of this contract, or in negotiating for it;* and that Douglas presented it for his signature; that all his dealings with the company, while logging the land, were with Douglas; that he never had anything to do with anyone else in connection with this deal; and that the latter came around and looked over the works on an average of about twice a week during the entire time the logging operations were carried on. Then, with reference to the special events herein set up, he testified:

"A. Why, I had several conversations with Mr. Douglas and in 1935, that is, the spring of 1935, he came to the job when I was working, and we talked about the yellow pine. Mr. Douglas asked me if I was going to take it out, and I said I would if I could sell it. So I tried to sell it and find I couldn't get a decent price, so Douglas came to the camp and talked to me and I asked him if he could sell it. He said he would see what he could do. So he came back over, oh, that was in the latter part of April, 1935, and he said the price wasn't any good, and that he couldn't make a price, so 'we will leave the yellow pine here and get the clearance for the brush disposal, and the Milwaukee isn't hurt and we will take it over.' "

The witness Johnson, who was employed and worked with defendant on the job in the spring of '35, and who was present when the conversation above referred to took place, testified:

"Q. Can you tell the Court and jury in your own words what Mr. Douglas said to Mr. Bogle?

"A. Yes.

"Q. Will you do so?

"A. Well, Douglas come just as we were eating dinner and they started to talk about the yellow-pine, and Douglas told Bogle if he would take the white pine and cedar, they will take the yellow-pine.

"Q. What did Bogle say?

"A. Said 'that will be fine.' "

Sanderson, who testified he was the General Manager for plaintiff company, testified as follows:

"Q. Does your Company have Mr. Douglas employed in some capacity?

"A. Yes, sir.

"Q. In what capacity is Mr. Douglas employed?

"A. Well, *if there is anything to do he does it. Cruising is next.* Looks after the scaling and the scalers that we employ. Checks their time up. Looks after trespass. In fire season, he looks after violations. Sees that we are protected as well as possible from fire, and if necessary, if we have *anything coming from anybody who isn't conforming, it is up to Mr. Douglas to look after that.*

"Q. You send him amounts sometimes to collect?

"A. Yes, sir."

Without expressing any view as to either the weight or credibility of any of the testimony above quoted, or other circumstances contained in the record, we hold that there was sufficient evidence to go to the jury. (*Carron v. Guido*, 54 Ida. 494, 33 Pac. (2d) 345; *Lightner v. Russell & Pugh Lbr. Co.*, 52 Ida. 616, 17 Pac. (2d) 349; *California Jewelry Co., Inc., v. McDonald*, 54 Ida. 248, 30 Pac. (2d) 778; *Hample v. McKinney*, 48 Ida. 221, 281 Pac. 1; *Bevercombe v. Denney & Co.*, 40 Ida. 34, 231 Pac. 427.)

The record in this case demonstrates the unwisdom and danger of a foreign attorney attempting to conduct a case in the trial court in a state where he is unfamiliar with the practice as is apparent in this case. It makes it difficult for the trial court and, in a measure, hazards the rights of the client, before both the court and the jury. Here Mr. Connelly (a non-resident attorney), who presented the case in court, was unfamiliar with the rules of pleading and practice in this jurisdiction and apparently thought that a reply was necessary. He was also unaware of the fact that the official reporter does not take opening statements of counsel as to what they intend to prove unless requested so to do. He was consequently under the necessity of showing by affidavits from the jurors, a very unsatisfactory practice, the nature of his opening statement; and this was done on motion for new trial. We feel it proper to make the fore-

going observations because of the fact that Mr. Buell does not appear to have actively participated in the trial of the case; and Judge Wernette did not appear in the case until after the judgment had been entered in the lower court.

A very thorough survey of this entire record leaves us with the feeling that the case ought to go back to the trial court for a new trial, where defendant's defense may be fully presented and passed upon by the jury.

The judgment is reversed and a new trial is granted. Costs awarded in favor of appellant.

Budge, Givens and Holden, JJ., concur.

Morgan, J., by reason of illness, did not participate in the decision.

---

ON PETITION FOR REHEARING.

(August 23, 1939.)

AILSHIE, C. J.—A petition for rehearing has been presented in this case, in which complaint is made that we erred in stating that the motion to amend the affirmative defense was made after the motion was made for an instructed verdict on the part of the plaintiff. There is room for confusion in sequence of events detailed but it is of such a nature that it makes no difference in the legal rights of the respective parties or the conclusion which should be reached.

The record at Folio 152 shows that counsel for the defendant rested his case as follows:

"Mr. CONNELLY: This is the defendant's case, if the Court please.

"The COURT: Gentlemen of the jury, you will be excused until called. (Jury retires.)"

(Here follows the motion to amend set out in the opinion herein.)

"The COURT: I am going to deny the motion, with the amendment asked.

"Mr. KEETON: Comes now the plaintiff in the action, and moves the Court to direct the jury to return a verdict for the plaintiff on the first cause of action, for the sum prayed for in the complaint, namely, the sum of $2,318.68, together with interest thereon in the sum of six percent, from March 26, 1936, and a verdict in favor of the plaintiff on the second cause of action, in the sum of $997.50, together with interest thereon in the sum of six percent, from the 28th day of March, 1936. Upon the grounds and for the reason that there has been no defense pleaded which has been sustained by any proof, or no proof which sustains any pleading that defendant asked in his affirmative defense. And that the testimony introduced on the part of the defendant is wholly insufficient to constitute any defense to the plaintiff's complaint.

"The COURT: I think I will deny the motion."

The record shows that further argument ensued and finally at Folio 159 plaintiff started in examining witnesses on rebuttal. The rebuttal testimony ensues to Folio 276, then arguments followed and sur-rebuttal was offered to Folio 287; whereupon both parties rested and counsel for plaintiff renewed his motion for directed verdict, which was subsequently granted.

So it is clear that defendant's motion to amend his affirmative defense *was made after he had introduced his evidence and rested his case.* Plaintiff did in fact introduce most of its evidence as rebuttal but defendant's evidence was already in and his case had been rested.

We find no cause for granting a rehearing or changing our views in this case.

Budge, Givens and Holden, JJ., concur.